**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **Case No: 1:21-CR-526 (TSC)** |
| | : | |
| JEFFERY FINLEY, | : | |
| | : | |
| Defendant. | : | |

**SENTENCING MEMORANDUM ON BEHALF OF JEFFERY FINLEY**

Defendant Jeffery Finley, through counsel, Aaron D. Moss, Assistant Federal Public Defender, files this Sentencing Memorandum, which endeavors to highlight the mitigating factors in his case to assist this Honorable Court in its "overarching duty under § 3553(a) to impose a sentence sufficient, but not greater than necessary to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper v. United States*, 562 U.S. 476 (2011) (internal quotations omitted). By means of genuine remorse, for having committed the crime and because of it, Mr. Finley accepts responsibility for entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1). The path he walked to that regrettable point on January 6, 2021, is winding. It was formed through a whirlpool of his own emotions that obfuscated his deepest truths amid torturing uncertainties over questions of identity and where he fits in. And while he understands that he cannot change his past, Mr. Finley is learning that he can overcome it to make a positive difference for his future. He takes this lesson to heart with sincere post-offense rehabilitative effort.

"[R]ecognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation," 18 U.S.C. § 3582(a), Mr. Finley moves for a sentence at the lowest end of the Guidelines with conditions that promote community service and continued therapeutic treatment.[1]

---

[1] *See* Nicholas Trietsch, LICSW, *Mitigation Report*, (December 1, 2022), attached as Exhibit 1 (a copy of this report is submitted under seal because it contains sensitive medical information. Concurrently with this memorandum, Mr. Finley has filed a motion to seal Mr. Trietsch's Report).

Based on an offense level of six (6) and a criminal history category I, the United States Sentencing Guidelines ("Guidelines) in the Presentence Investigation Report ("PSR") recommend between zero (0) and six (6) months. The low end of that range fulfills the factors and goals of 18 U.S.C. § 3553(a) in a manner that is sufficient but not greater than necessary. The low end of that range best reflects the "precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense" and "according to the evolving standards of decency that mark the progress of a maturing society." *Miller v. Alabama*, 567 U.S. 460 (2012).

## I. INTRODUCTION

Mr. Finley is a thirty (30) year old biracial man with a compelling, at times deeply tragic, history. His is a complex inheritance. He never knew a father. Only recently did he learn the truth as to why. *See* PSR ¶ 62. He was raised as the only child in a single-parent military family. A childhood pulled apart and scattered in the Air Force bases where his mother served. Mr. Finley grew up at the intersection of loneliness and oppression. From there, he has struggled to navigate a reality that is more nuanced than what most people are made to endure. Along the way, he has made some mistakes. The most serious being his offense at the United States Capitol on January 6, 2021, which forms the basis of his guilty plea to entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1).

Mr. Finley was arrested in connection with his offense on March 22, 2021. He was released on a personal recognizance bond. On April 6, 2022, he pleaded guilty to violating 18 U.S.C. § 1752(a)(1) pursuant to a written plea agreement. By admitting his culpability and pleading guilty, Mr. Finley takes responsibility not only for his crime; but also, for addressing the root causes of it. For all the reasons set forth herein, a sentence at the lowest end of the Guidelines is sufficient and just in this case.

## II. DISCUSSION

The fact of the matter is that this case shined light on a part of Mr. Finley that he can no longer ignore. Post-offense, he has shown commitment "to fully realize what's going on within myself and begin healing." Exhibit 1 at 4. He endeavors to examine his own thoughts, actions, and the deeper feelings from where they arise. He has been "forthright, cooperative, and receptive to therapy services and interventions." *Id*. at 6. The questions that this case forced him to confront carry a weight heavier than the iron bars of a prison cell. Most pressingly: how a biracial man raised by a single mother (whom he demonstrably respects and loves) decides to join a self-described, "Western chauvinist," organization that "regularly spout white nationalist memes and maintain affiliations with known extremists . . . alongside other hate groups"? *See* S. Poverty L. Center, *Proud Boys*, *available at* https://www.splcenter.org/fighting-hate/extremist-files/group/proud-boys (last accessed January 25, 2023).

It may never be possible, perhaps not even for Mr. Finley, to fully understand what caused him to join the Proud Boys and participate in the Capitol Riot on January 6, 2021. Nonetheless, certain factors underlying that conduct are mitigating and call for compassion when crafting a sentence pursuant to the goals of § 3553(a). "***Subsection A***" details those mitigating factors, which make up Mr. Finley's history and characteristics and help contextualize the nature and circumstances of his offense conduct pursuant to § 3553(a)(1). "***Subsection B***" filters those findings through a § 3553(a)(2) analysis to showcase the sufficiency of a sentence at the low end of the Guidelines. "***Subsection C***" considers the kinds of sentences available, as mandated by § 3553(a)(3) and § 3553(a)(4), to illustrate reasonable options for a low-end sentence. "***Subsection D***" highlights the pertinent policy statements that support sentencing at the low end of the Guidelines pursuant to § 3553(a)(5) and then, takes all those considerations unique to this case to show how a low-end sentence avoids the risk of unwarranted disparity under § 3553(a)(6).

**A.     The offense and offender: Mr. Finley suffers from human failings, which mitigate more than magnify the crime and the punishment to ensue, 18 U.S.C. § 3553(a)(1).**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 536 U.S. at 487 (quoting *Koons v. United States*, 518 U.S. 81, 113 (1996)). When viewed through the statutory factors found in § 3553(a)(1), which call for this Court to consider "the nature and circumstances of the offense and the history and characteristics of the offender," Mr. Finley's failings, while serious, are not without significantly mitigating features. The four sentencing factors packaged in § 3553(a)(1) warrant leniency in the form of a low-end Guidelines sentence.

**1.     Mr. Finley's history and characteristics.**

The PSR provides the waypoints by which Mr. Finley came to be involved in this case. It charts out the tragic course he walked to wind up before this Court. It starts on a military base in Japan. *See* PSR ¶¶ 60-62a. "Highly relevant, if not essential, to the selection of an appropriate sentence is the possession of the *fullest information possible* concerning the defendant's life and characteristics." *Pepper,* 562 U.S. at 476 (emphasis added). "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Mr. Finley asks the Court to consider where he comes from and how his past shaped the mental and emotional conditions present in this case. *See California v. Brown*, 479 U.S. 538, 545 (1987) (O'Conner J., concurring) (evidence about background and character "is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse").

4

Mr. Finley is a biracial man born on September 30, 1992, in Misawa, Japan, to a white mother and a black father. PSR ¶ 60. His mother served in the United States Air Force as a combat photographer. *Id*. His father also served in the U.S. Air Force. The PSR provides all the reasons why his parents were never married and why he was left fatherless from birth. *Id*. ¶¶ 60-62a.  His mother "denied there ever being any real father figure in her son's life." *Id*. ¶ 62a. Nor was there "the support of extended family . . . it was only himself and his mother." *Id*. ¶ 61. He never met his father. He never knew a father. He only recently found out why. Mr. Finley did not even know his father's name until he read it in the PSR that was prepared for this case. *See id*. ¶ 60. The PSR does well to say, "[t]his information has been quite a lot for him to become aware of, and he is still processing . . .." *Id*. ¶ 62. Most certainly, Mr. Finley should be reminded that he bears no culpability for the circumstances that he was born into and impacted by.

Mr. Finley's childhood played out in the shadows on the bases where his mother was stationed. "[His] mother worked often and he mainly stayed within the residence." *Id*. ¶ 61. He felt his father's absence when left alone at home as a "latch-key-kid." *Id*.  ¶ 62a. That early isolation impacted Mr. Finley. His mother "indicate[s] [he] was very independent as a child." *Id.* ¶ 62. She notes how "[he] has always been protective of the household and has tried to be the man of the house given it has just been the two of them." *Id*. ¶ 62a. Mr. Finley got early practice at stoicism as a child tasked to protect an empty home with no supervision. A home that changed ten (10) times within the span of ten (10) years between the ages of three (3) and thirteen (13). *Id*. ¶ 64. "He and his mother left Japan before he turned two years old." *Id*. ¶ 64. His mother, then, moved them every year for a decade. *Id*. He recalls that instability and how it negatively impacted his ability to "mak[e] and maintain friendships throughout his elementary, middle school, and high school experiences." Exhibit 1 at 2. "[H]e ha[s] no lasting relationships as a result."  PSR ¶ 61.

"Mr. Finley experienced challenges of community integration associated with his family affiliation with the U.S. Military." Exhibit 1 at 9. His childhood by-in-large was transient until he and his mother settled in West Virginia.  In West Virginia, he experienced severe discrimination. Mr. Finley still remembers the painfully oppressive, hate-filled words used by a bus driver on his first day of school in Hampshire County, West Virginia. *See id*. at 2. "[He] recall[s] experiences of severe discrimination" far beyond what was said to him on that school bus. *Id*. He reports continued bullying, racial epithets, and over sixteen fights occurring in the Hampshire County School System." *Id*. "Jeffery grew up facing challenges with connection to peers as well as significant and severe experiences of verbal abuse, physical altercations, and discrimination throughout his middle school to high school years." *Id*. at 6.

> [R]acial insults are in no way comparable to statements such as, "You are a God damned . . . liar," which [a standard guide] gives as an example of a "mere insult." Racial insults are different qualitatively because they conjure up the entire history of racial discrimination in this country.

*Taylor v. Metzger*, 152 N.J. 490, 510, 706 A.2d 685, 694 (1998) (internal citation omitted).

Mr. Finley has been impacted by his experiences with racism. All of it made more problematic by the fact that no adult in his life shared his racial identity or experience. He was never taught the history of racial discrimination in this country by a person who lived it. He had no one to mitigate the loneliness of being biracial in America. What he had, instead, was stoicism. He suffered it all and he suffered it alone. *See* Exhibit 1 at 5 (finding Mr. Finley's "use of stoicism . . . a reaction to ideals of sexism associated with men in American society being restricted in the ability to share and validate emotions"). He used stoicism "to assist with minimizing racial concerns in his life." *Id*. "Jeffery at times describes discrimination experiences associated with his race while minimizing the impact on his emotional and physical wellbeing." *Id*. at 5. "Mr. Finley exhibits ideologies associated with 'Color Blindness' and . . . meritocracy." *Id*.

"Racism is difficult to address or cure because it is not acknowledged." RICHARD DELGADO ET AL., CRITICAL RACE THEORY: AN INTRODUCTION 8 (3rd ed. 2017). Consequently, the use of ideologies like stoicism and color blindness to address individual experiences with racism risk compounding the problem.[2] To be sure, Mr. Finley faces "challenges navigating healthy masculinity intersecting with racial prejudice and discrimination on an individual level." Exhibit 1 at 9. He was forced to grow up in the negative space where his father should have been. In that space, he internalized a lot of hate towards himself. A lot of people failed him before he failed himself and society by the instant offense. That history and its resulting characteristics cannot be so easily separated from the instant offense. "[T]hese experiences influence his interest and participation in what he describes as a "fraternal" organization . . . the Proud Boys." *Id*. at 6.

### 2. The nature and circumstances of Mr. Finley's offense.

Mr. Finley was born into and suffered a perfect storm of tragic circumstances that propelled him into the Proud Boys and then the Capitol on January 6, 2021. *See Com. of Pa. ex rel. Sullivan v. Ashe*, 302 U.S. 51, 58 (1937) ("[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense"). The same history that acts as mitigation in his case is also what made him highly vulnerable to recruitment from the Proud Boys, a group known to be "mindful of optics and framing and resort to varying tactics to obscure their ideology and encourage potential recruits to join."[3]

---

[2] See RICHARD DELGADO ET AL., CRITICAL RACE THEORY: AN INTRODUCTION 27 (3rd ed. 2017) ("color blindness . . . will allow us to redress only extremely egregious racial harms, ones that everyone would notice and condemn. But if racism is embedded in our thought processes and social structures . . . then the 'ordinary business' of society—the routines, practices, and institutions that we rely on to do the world's work—will keep minorities in subordinate positions. Only aggressive, color-conscious efforts to change the way things are will do much to ameliorate misery."

[3] Samantha Kutner, *Swiping Right: The Allure of Hyper Masculinity and Cryptofacism for Men who Join the Proud Boys*, INT'L CNT'R FOR COUNT'R-TERROR. 2 (May 26, 2020), https://icct.nl/app/uploads/2020/05/ Swiping-Right-The-Allure-of-Hyper-Masculinity-and-Cryptofascism-for-Men-Who-Join-the-Proud-Boys.pdf (last visited Feb. 1, 2023).

For example, Mr. Finley is a man who has faced lifelong challenges of community integration. *See* Exhibit 1 at 9. The "Proud Boys recruitment targets men looking for community."[4] Mr. Finley is a son with absolute uncertainty about a father or where he fits in. *See* PSR ¶¶ 60-62a. The Proud Boys "recruits through shared precarity . . .." Kutner, *supra* at 23. Mr. Finley is biracial male deprived of the chance to express his grievances in terms the system would understand. *See* Exhibit 1 at 5. The Proud Boys "recruits through shared . . . male grievances." Kutner, *supra.* Mr. Finley is a marginalized person who uses stoicism and humor "while talking about culture, ethnicity, and race" as a means "to assist with minimizing racial concerns in his life" and the "impact [of experiences associated with his race] on his emotional and physical wellbeing." Exhibit 1 at 5-6. "Provocation is a central component of the Proud Boys recruitment strategy . . . fostered through memes with varying levels of desensitizing content against marginalized groups." Kutner, *supra* at 11.  "The culmination of his experiences . . . help[s] frame and make sense of his "all-in experience" around participation in the Proud Boys." Exhibit 1 at 7. And although his history does not excuse his crime, how his history impacted his involvement does contextualize the unique circumstances of this case in a manner that mitigates the harshest forms of punishment.

Mr. Finley joined the Proud Boys in or around 2019.  He had been "searching for a 'men's group' to assist him with his feelings of isolation and lack of connection in his life and community." *Id*. at 3. He had recently been made aware of some information about his father that challenged his prior understandings and he wanted "to find a space to meet and spend time with people who shared characteristics in men [he] idealize[d]." *Id*. "His focus in the organization has always been towards a fraternal bond with other men." *Id*. at 7.

---

[4] Will Carless, *They joined the Wisconsin Proud Boys looking for brotherhood. They found racism, bullying and antisemitism*, USA TODAY (June 21, 2021), https://www.usatoday.com/story/news/nation/2021/06/21/proud-boys-recruitment-targets-men-looking-community/7452805002/?gnt-cfr=1 (last visited Feb. 1, 2023).

Initially, Mr. Finley "describes his experiences with the Proud Boys as insular and close-knit." *Id*. "He also reports feeling connected, desired, and supported while participating in the Proud Boys." *Id*. at 4. "Jeffery identified taking to leadership roles in the Proud Boys Organization as reminiscent of his experiences with Mountaineer Challenge Academy, an important and formative time in his life." *Id*. Mountaineer Challenge Academy was a military school that he had been placed at, "per his mother's preference." PSR ¶ 76. His positive experiences of leadership, problem solving, and collaboration through the Mountaineer Challenge Academy translated well to building up toward leadership positions in the Proud Boys Organization." Exhibit 1 at 7.

By 2021, Mr. Finley "was the president of a West Virginia chapter of the Proud Boys." PSR ¶ 18. Notably, "[e]ach chapter is autonomous." *Id*. Mr. Finley was not accepted into a West Virginia chapter of the Proud Boys. Nor was he promoted to the position of president from within a West Virginia chapter of the Proud Boys. Instead, he became the president of a West Virginia chapter of the Proud Boys because he started his own chapter. Mr. Finley denies "feeling isolated or discriminated against in his experiences with the organization." Exhibit 1 at 3. A close reading of the encrypted messaging group titled "Boots on Ground," convinces otherwise. "In his life, experiences of internalized racism assisted Jeffery in overlooking, minimizing and making light of the white supremacist aspects of the Proud Boys." *Id*. at 7.

Mr. Finley "followed the Proud Boys leadership," PSR ¶ 21, leading up to and during the January 6, 2021, Capitol Riot. As alluded to above, he was part of the "Boots on Ground" messaging group, which included all those Proud Boys members who were planning to attend the events in Washington D.C. on January 6, 2021. *Id*. ¶ 19. He was not part of the "Ministry of Self Defense," or its encrypted messaging group, which included Henry Tarrio, Ethan Nordean, Joseph Biggs, Ormond Beach, Zachary Rehl, Dominic Pezzola, and allegedly far more serious conduct.

Seen above, the unique nature of Mr. Finley's criminal failing is, in part, mitigating. And although not an excuse for his crime, Mr. Finley's offense conduct is significantly less aggravating than those Proud Boys listed above, if not most of the other people who participated in the January 6, 2021, Capitol Riot. The facts of this case are not in dispute. The Statement of Offense, *see* Docket No. 38, details Mr. Finley's unlawful entry into the Capitol on January 6, 2021. Importantly, those facts show that he: (1) did not lead the group of Proud Boys that marched to the Capitol, *id*. at 4; (2) did not participate in the dismantling of barricades erected around the Capitol, *id*. at 4-5; (3) did not lead the advance on the Capitol; but rather, "moved with the crowd" and "followed the crowd," *id*. at 5; (4) did not enter the Capitol until others had gone in, *id*. at 6; (5) did not wear protective gear, *id*; (6) did not engage in any violence; (7) did not engage in any property damage; (8) did not enter any room within the Capitol; but instead, stayed in the hallway, *id*.; (9) did not remain in the Capitol for more than a few minutes; and (10) did not prolong the federal case against him; but rather, timely accepted responsibility for it.

To be clear, Mr. Finley made serious mistakes. He is trying to make those mistakes whole. He is accountable for having deleted social media accounts, photos, and videos of his conduct at the Capitol and for having told others to do the same. On information and belief, this conduct occurred prior to the start of the investigation. Additionally, what he deleted was recovered and made part of discovery. None of it constitutes an excuse. But his focus is on moving forward in a forthright manner. He respects the law.  His sentence should be tempered by that fact. He has demonstrated contrition and with it, "the likelihood that he will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, [and] the degree to which he . . .  does not deem himself at war with his society." *Roberts v. United States*, 445 U.S. 552, 558 (1980) (citations omitted) (internal quotations omitted).

He also holds himself accountable for having been a Proud Boy. He accepts that his past as a Proud Boy may presently result in imprisonment. But he knows he can overcome that past. This case has shown the Proud Boys as an inherently toxic organization.  He takes that lesson with him when looking inward into his own past with the Proud Boys and the aspects of his character that called him to them. He has identified "increased experiences of discrimination and mistrust, as well as a lack of support from the members he considered close to him." Exhibit 1 at 7. "He also identified feelings that the organization 'ruined his life.'" *Id*.   Mr. Finely may always carry the weight of a tragic history, but now he carries that weight away from those who would distort his hurt into hate. He has walked away from all affiliations with the Proud Boys. "Mr. Finley reports no further communication with any affiliated Proud Boy member officially or socially." *Id*. This case is his last connection to that group.

**B.      The purposes of sentencing: the low end of the Guidelines is sufficient but not greater than necessary for punishment, deterrence, incapacitation, and rehabilitation, 18 U.S.C. § 3553(a)(2).**

The real facts and circumstances of this case make a low-end guideline sentence "sufficient, *but not greater than necessary*, to comply with the goals set forth in [§ 3553(a)(2)]." 18 U.S.C. § 3553(a) (emphasis added). In no uncertain terms, that statute mandates a measure of restraint when exercising the power to impose a sentence upon a person. Pursuant to § 3553(a)(2), a minimally sufficient sentence need:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). For Mr. Finley, a sentence at the low end of the Guidelines is sufficient for all those purposes of punishment, deterrence, incapacitation, and rehabilitation.

1.      **Just punishment and respect for the law.**

Just as a sentence that is too short may fail to reflect the seriousness of the offense, promote respect for the law, or provide just punishment, so too will a sentence that is excessively harsh. *See Gall v. United States*, 552 U.S. 38 (2007) ("a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing"). Mr. Finely respectfully requests that the Court again consider how he got here. His path is incredibly personal. He is only beginning to process his history. His case comes complete with circumstances that are, in equal part, nuanced and complex. For the first time, he is facing down truths about who he is and where he is from. From where we find Mr. Finley, the purposes of punishment found in § 3553(a)(2)(A) forfeit some of their promised reward. A sentence at the low end of the Guidelines sufficiently "reflect[s] the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Mr. Finley has a criminal history category I based on zero (0) criminal history points. PSR ¶ 54. The collateral consequences that flow from this crime, *his first crime*, also add plenty to retribution and decrease the need to punish him beyond the low end of the Guidelines. "Mr. Finley reports numerous impacts in his social relationships . . . associated with the January 6th federal charges." Exhibit 1. At 8. "He reports financial impacts associated with his federal charges which include limitations in his abilities to access online services including PayPal and Cash App." *Id*. He reports having to participate in Secondary Security Screening Selection (Quad S) during travel that includes flights." *Id*. He reports being "labeled a Suspected Domestic Terrorist in Law Enforcement databases, which from his experience, has increase his optics and presence by law enforcement in the community." *Id*.

Here it bears repeating: Mr. Finley's feelings of guilt over his conduct in this case appear genuine. He is remorseful for having participated in the Capitol Riot on January 6, 2021. He is also remorseful for having participated in the Proud Boys. *See* Exhibit 1 at 7 (Mr. Finley "processed feelings that he had lost 'years' associated with previous experiences of depression as well as his participation with the Proud Boys Organization"). His total break from all affiliation with the Proud Boys is strong evidence of his acceptance of responsibility, guilt, and remorse. He shares his experience of remorse with candor. *See* Exhibit 1 at 8.

## 2.    Adequate deterrence and protection.

Sentencing Mr. Finley to the low end of the Guidelines further achieves the goals of general and specific deterrence to future criminal conduct, *see* 18 U.S.C. § 3553(a)(2)(B)-(C), in a manner that is sufficient, but not greater than necessary. Custody is not required. As a general matter, "[e]mpirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes."[5] As to specific deterrence, "there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."[6] Indeed, in its own study of over 15,000 offenders, the Commission found that those with a criminal history category I have a 12.7% recidivism rate when provided the opportunity of probation versus 14.8% recidivism rate when sentenced to prison.[7]

---

[5]  Brennan Center for Justice, *What Caused the Crime Decline?* 26 (Feb. 2015), *available at* https://www.brennancenter.org/publication/what-caused-crime-decline (last visited Feb. 2, 2023).

[6] Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (Aug. 2013), *available at* https://www.jstor.org/stable/10.1086/670398 (last visited Feb. 2, 2023).

[7] *See* United States Sentencing Commission, *Recidivism: Criminal History Computation of the Federal Sentencing Guidelines*, at Ex. 12 (2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited Feb. 2, 2023).

The Commission's findings are important to Mr. Finley's case. Given his criminal history category of I based on zero (0) criminal history points, PSR ¶ 54, the data suggests that the goal of deterrence is more readily achieved through a noncustodial sentence than through imprisonment. What is more, Mr. Finley's post-offense rehabilitation efforts and success on pretrial release suggest a sincere desire to reform his behavior without the need for a term of imprisonment. *See United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011) ("[d]emonstrated self-motivated rehabilitation is direct and relevant evidence of 'the need for the sentence imposed' . . . to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant"); *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (exemplary behavior on pretrial release shows unlikelihood of reoffending). He has disavowed the Proud Boys. He is in therapy. He is working full-time. He is substantially compliant with the terms of his pretrial release.

However, in the event that this Court is considering the need for imprisonment to fulfill the statutory goals of deterrence and incapacitation under § 3553(a)(2)(B)-(C), then, Mr. Finley would highlight the fact that he has never previously been exposed to any term of imprisonment and "[g]enerally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend." *United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D.Wis. 2005). Furthermore, according to the National Institute of Justice, which is a program of the United States Department of Justice ("DOJ"):

> Sending an individual convicted of a crime to prison isn't a very effective way to deter crime. Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crimes. Prisons actually may have the opposite effect. Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.[8]

---

[8] National Institute of Justice, *Five Things About Deterrence* (May 2016), *available at* http://www.nij.gov/five-things/pages/deterrence.aspx (last visited Feb. 2, 2023).

For an offender like Mr. Finley, the Commission and DOJ appear to agree that a sentence of imprisonment risks more harm than good to the goals of deterrence and protection. It is exposure to more serious offenders who may do more to increase his risk of recidivism and danger to the public than to mitigate it. The goals of § 3553(a)(2)(B)-(C) caution against imprisonment.

### 3. Effective rehabilitation.

A noncustodial sentence at the low end of the Guidelines also makes for the most effective means to meet the goals of § 3553(a)(2)(D). Mr. Finley recognizes that he needs the help of services for treatment of his mental and emotional health. Meanwhile, statute recognizes that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). These services are most effectively provided in the community, where Mr. Finley will also be under the care, guidance, and structure of the United States Probation Office. Already, he is actively engaged in ongoing therapeutic treatment.[9] His therapist "recommend[s] considering and exploring possible alternatives to incarceration" *Id*. Alternatives, which would allow for additional therapeutic interventions including: "exploration of core beliefs that intersect with race, gender, and spirituality to help identify values associated with strengths and goals in Jeffery's life functioning moving forward[,]" "participation in Cognitive Behavioral Therapy skills that target unhelpful thinking styles as well as emotional identification and validation[,]" and "participation in peer support Mens' group such as the Mankind Project . . to assist with exploration around concepts of emotional maturity and building community involvement in peer based collaboration around positive and healthy masculinity experiences." *Id*. at 6. Therapy with Mr. Trietsch is working for Mr. Finley and there is no reason in § 3553(a) why it should not be allowed to continue.

---

[9] *See* Nicholas Trietsch, LICSW, *Professional Page*, *available at* https://www.nurturebalancewv.com/nick (last visited Feb. 2, 2023) (regarding Mr. Trietsch's education, counseling philosophy, services offered, and specialties).

**C.**     **The sentences available: a noncustodial sentence is authorized within the limits fixed by law and the Guidelines, 18 U.S.C. § 3553(a)(3)-(4).**

In determining an appropriate sentence, § 3553(a)(3) directs the Court to consider all "the kinds of sentences available." Among the sentences available, § 3553(a)(4) directs consideration into the sentencing range produced by the Guidelines. In this case, both subsections of the sentencing statute authorize alternatives to imprisonment. For Mr. Finley's offense of conviction, Congress set the statutory range of imprisonment at zero (0) to one (1) year. *See* 18 U.S.C. § 1752(a)(1). Following any period of incarceration, the Court may impose a term of supervised release of not more than one (1) year. *See* 18 U.S.C. § 3583(b)(3). Here, Congress has also authorized up to five (5) years of probation pursuant to 18 U.S.C. § 3561(c)(2).

Under the Guidelines, Mr. Finley is equally eligible for a noncustodial sentence. Pursuant to USSG § 2B2.3(a), the PSR calculates Mr. Finley's base offense level at four (4) because his offense involved trespass. PSR ¶ 43. The PSR provides a two (2) level increase pursuant USSG § 2B2.3(b)(1)(A)(vii) because the trespass occurred at a restricted building or grounds. *Id*. ¶ 44. The PSR applies another two (2) level increase pursuant to USSG § 3C1.1 for obstruction. *Id*. ¶ 47. The PSR, then, applies a two (2) level downward adjustment for acceptance of responsibility pursuant to USSG § 3E1.1(a), resulting in a total offense level of six (6). *Id*. ¶¶ 50-51. With a total offense level of six (6) and a criminal history category of I, the Guidelines recommend a sentence of imprisonment within the range of zero (0) to six (6) months. *Id*. ¶ 98.  Mr. Finley's Guidelines fall within Zone A of the Sentencing Table. Because the applicable Guidelines range is within Zone A, "a sentence of imprisonment is not required." *Id*. The Guidelines expressly allow for a term of probation without a period of incarceration. A sentence of time served, followed by a term of supervised release is also authorized under the Guidelines. *Id*. ¶ 104.

As discussed above, the statutory goals of sentencing found in § 3553(a)(2) are best achieved through a noncustodial sentence. It may take the form of a time served sentence, crediting the arrest on March 22, 2021, followed by up to one (1) year of supervised release. Alternatively, it may take the form of up to five (5) years' probation. Incidentally, a five (5) year term of probation represents the longest criminal justice sentence available to the Court. Both sentencing options involve the possibility of conditions that make for "substantial restriction[s] of freedom." *See Gall,* 552 U.S. at 48. Conditions like community confinement or home detention may be imposed. The condition of "intermittent confinement" may also be imposed. *See* 18 U.S.C. § 3563(b)(10); *see also* USSG § 5F1.8. For Mr. Finely, this would mean "remaining in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time;" USSG § 5F1.8, comment. (n.1), while still being allowed to continue therapeutic treatment and employment in a community setting.

Numerous other conditions will also attach, all of them "reasonably related to the sentencing factors set forth in [§ 3553(a)]," but which, "involve no greater deprivation of liberty tha[n] is reasonably necessary for the purposes set forth in [§ 3553(a)(2)]."   PSR ¶ 111a. Community service should be considered. Such sentencing options should not be taken lightly and need to factor into the Court's sentencing calculus. They do not undermine the law; but instead, are contemplated by it. They will minimize Mr. Finley's risk of recidivism and maximize the public's safety. All the while, they will ensure that he continues to receive therapeutic counseling in the community, maintains his employment, and remains away from those people who would pose a bad influence on his thoughts and behaviors. They provide the Court with the tools, and Mr. Finley with the incentive, to achieve all the factors and goals of sentencing most readily. The Court's ability to impose a noncustodial sentence and to incarcerate Mr. Finley should he violate the terms and conditions of that sentence provide these tools and incentives in abundance.

**D.    The policy and practice of sentencing: a sentence at the low end of the Guidelines is supported by policy and by the need to avoid unwarranted sentencing disparity, 18 U.S.C. § 3553(a)(5)-(6).**

To the extent they are applicable under § 3553(a)(5), policy statements within the Guidelines, which concern specific offender characteristics, support leniency in the form of a low-end or noncustodial sentence. Pursuant to Chapter 5, Part H, of the Guidelines, "the most appropriate use of [these] specific offender characteristics is to consider them not as a reason for a sentence outside the applicable guideline range, but for other reasons, such as in determining the sentence within the applicable guideline range, the type of sentence (*e.g.,* probation or imprisonment) within the sentencing options available for the applicable Zone on the Sentencing Table, and various other aspects of an appropriate sentence." Mitigating details, applicable to various specific offender characteristic policy statements appear throughout the PSR and this memorandum. The following policy statements found in the Guidelines point towards the appropriateness of a sentence at the low end of the recommended range, which in this case is zero (0) months: age pursuant to § 5H1.1, mental and emotional conditions pursuant to § 5H1.3, employment record pursuant to § 5H1.5, family ties and responsibilities pursuant to § 5H1.6, criminal history pursuant to § 5H1.8, and lack of guidance as a youth and similar circumstances pursuant to § 5H1.12.

In addition to the preceding considerations, § 3553(a)(6) includes the need for any sentence imposed to avoid unwarranted sentence disparities. Here, a review of sentences imposed for other defendants convicted under 18 U.S.C. § 1752(a)(1) for their involvement in the January 6, 2021, Capitol Riot supports the reasonableness of a sentence at the low end of the Guidelines. With the forgoing in mind, Mr. Finley respectfully directs the Court's attention to the following cases:

**Treniss Evans III**, 1:21-CR-00225 (DLF). Sentenced to thirty-six (36) months' probation with a condition of twenty (20) days intermittent confinement with a $5,000 fine and $500 restitution. Pertinent facts include that he entered the Capitol building, used a megaphone to encourage others to enter the Capitol building, entered a Congressional conference room and drank Fireball whiskey, remained in the Capitol building for approximately twenty (20) minutes, and had affiliation with the Proud Boys.

**Blake Reed**, 1:21-CR-00204 (BAH). Sentenced to thirty-six (36) months' probation with condition of forty-two (42) days intermittent confinement, and three (3) months home detention with $2,500 fine and $500 restitution. Pertinent facts include that prior to January 6, 2021, he posted on social media that he was "feeling pissed off" and that "you will see the Republic side of this country go into anarchy stronger than 1776 . . . The Republic Rebellion is coming soon!" Additional pertinent facts include that he wore protective gear like ski goggles and a respirator mask, entered the Capitol building, remained in the Capitol building for approximately twenty-four (24) minutes, took steps to conceal evidence of his participation in the events at the Capitol, and had affiliation with the Proud Boys (co-defendant Bledsoe).

**Robert Schornak**, 1:21-CR-00278 (BAH). Sentenced to thirty-six (36) months' probation with condition of twenty-eight (28) days intermittent confinement, and two (2) months home detention with $500 restitution. Pertinent facts include that prior to January 6, 2021, he stated the following: "We're obviously going next week, we can't stay home n watch our republic be stolen. They want a fight let's have it" and "I'm going to DC on the 6th and I don't expect it to be peaceful." Additional pertinent facts include that he wore protective gear like a military-style tactical vest and helmet, entered the Capitol building, remained in the Capitol building for over ten (10) minutes, and stole an American flag from the Capitol building.

### III. CONCLUSION

The Supreme Court of the United States once declared that "retribution is no longer the dominant objective of the criminal law." *Williams v. People of State of N.Y.*, 337 U.S. 241 (1949). Instead, sentences based on restorative justice that emphasize "[r]eformation and rehabilitation of offenders have become important goals of criminal jurisprudence." *Id*. These are the standards of decency that should be used in this case to mark the progress of our maturing society. Given all the mitigating circumstances present in this case and Mr. Finley's post-offense rehabilitative efforts, the Court rightfully has the discretion to show him compassion and lenity in the form of a sentence at the low end of the Guidelines.

Respectfully submitted,

**JEFFERY FINLEY,**
**by counsel,**

/s/*Aaron D. Moss*
Aaron D. Moss (WV Bar # 12789)
Federal Public Defender Office
651 Foxcroft Avenue, Suite 202
Martinsburg, West Virginia 25401
Tel. (304) 260-9421
Fax. (304) 260-3716
E-Mail. Aaron_Moss@fd.org
*Attorney for Defendant*

## CERTIFICATION OF SERVICE

I hereby certify that on February 3, 2023, I electronically filed the foregoing, ***Sentencing Memorandum on Behalf of Jeffery Finley***, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Jason Bradley Adam McCullough
U.S. Attorney's Office
555 4th Street NW
Washington, DC 20530

/s/*Aaron D. Moss*
Aaron D. Moss (WV Bar # 12789)
Federal Public Defender Office
651 Foxcroft Avenue, Suite 202
Martinsburg, West Virginia 25401
Tel. (304) 260-9421
Fax. (304) 260-3716
E-Mail. Aaron_Moss@fd.org
*Attorney for Defendant*