**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-526 (TSC)** |
| **v.** | : | |
| | : | |
| **JEFFERY FINLEY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jeffery Finley ("Finley") to 90 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 restitution.

## I.    Introduction

The defendant, Jeffery Finley, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on April 6, 2022 (ECF 38) reflects a sum of more than $1.4 million dollars for repairs (*id.* at ¶ 5), the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On April 6, 2022, Finley pleaded guilty to one count of 18 U.S.C. § 1752(a)(1): Knowingly Entering and Remaining in any Restricted Building or Grounds without Lawful Authority.  As explained herein, a sentence of ninety days of imprisonment, with supervised release to follow, is appropriate in this case because: (1) Finley was among the first wave of individuals to cross onto Restricted Grounds of the Capitol at approximately 12:53 p.m.; (2) Finley remained on Restricted Grounds for approximately two hours as Finley watched law enforcement attempt to repel the crowd using riot control techniques and pepper spray; (3) while on Capitol grounds, Finley advised individuals he had traveled to D.C. with to come to the Capitol; (4) Finley then chose to enter the Capitol with a group of individuals he had arrived at the Capitol with two hours earlier; (5) after leaving the Capitol, Finley advised others who remained at the Capitol about the conditions outside the building and that "[i]f you guys come out, you're not getting back in"; and (6) Finley took measures to obstruct the government's investigation into criminal conduct at the Capitol by deleting his social media accounts and photographs and videos of himself and others at the Capitol and by directing others to delete their photographs.

The Court must also consider that Finley's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, including a large group with whom Finley traveled to the Capitol, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Finley's participation in a riot that succeeded in halting the Congressional certification combined

with his action in connection with members of his group renders a jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 38 (Statement of Offense), at ¶¶ 1-6. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### *Jeffery Finley's Role in the January 6, 2021 Attack on the Capitol*

As of January 6, 2021, Finley was the president of a West Virginia chapter of the Proud Boys. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." As the president of his chapter, Finley was the highest-ranking member in his local chapter.

Finley traveled to Washington, D.C., as a member of the Proud Boys for the election-related rally on December 12, 2020. On the evening of December 12, 2020, several individuals, including Proud Boys members, were involved in an altercation in downtown Washington, D.C. During that altercation, a member of the Proud Boys from North Carolina, among others, was stabbed. Also on the evening of December 12, 2020, a group of Proud Boys were marching in the streets near Asbury United Methodist Church. Members of the Proud Boys stole and burned a banner from the church's property. The Proud Boys Chairman, Enrique Tarrio, later publicly admitted that he was present and that he had burned the banner.

On December 29, 2020, Tarrio posted a public message on the social media site Parler regarding the event in Washington, D.C. on January 6. Tarrio posted that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist … We will not be wearing our traditional Black and Yellow. We will be incognito and we will spread across downtown DC in smaller teams. And who knows….we might dress in all BLACK for the occasion." On December 30, 2020, Finley advised other Proud Boys presidents that "Me and my WV boys are going."

Finley traveled to Washington, D.C. on January 5, 2021, with one member of Finley's Proud Boys chapter and that member's spouse. Finley posted messages on the evening of January 5 indicating that he was present in Black Lives Matter plaza.

On January 5, 2021, at approximately 1:33 p.m., Finley joined an encrypted messaging group titled "Boots on Ground." Finley understood that the Boots on Ground messaging group included Proud Boys members who were planning to attend the event in Washington, D.C. on January 6, 2021. At approximately 8:28 p.m., a message was posted in the Boots on Ground chat that directed members of the chat to "meet at the Washington Monument at 10am tomorrow morning! Do not be late! Do not wear colors! Details will be laid out at the pre meeting! Come out at as [sic] patriot!"

On the morning of January 6, 2021, Finley arrived at the Washington Monument. As shown below, Finley was dressed as a "patriot" in a blue suit and a red hat.



At approximately 10:30 a.m., Finley joined a large group of Proud Boys who were led away from the Washington Monument and the speeches that were taking place on the Ellipse. Finley marched with the group toward the Capitol. Finley recognized a Proud Boys leader named Ethan Nordean, who he knew as "Rufio," as the person who was leading the march.

Around 11:00 a.m., the group arrived at First Street, Northwest, which is located on the west side of the Capitol. Finley then marched with the group to the east side of the Capitol and then back to the west side of the Capitol where the group stopped near Constitution Avenue and Second Street, NW at approximately 12:15 p.m. The group, including Finley, remained in that area for approximately 30 minutes. At approximately 12:45 p.m., as former President Trump continued to deliver a speech at the Ellipse, Nordean and Biggs directed the group to the Peace Circle near the Capitol grounds. Finley traveled with the group as they marched back toward the Capitol.



As Finley arrived with the large group of Proud Boys at the Peace Circle at approximately 12:50 p.m., it was clear to Finley that the U.S. Capitol Police had barricaded the area and restricted access to it.  Immediately after arriving at the pedestrian entrance, Finley saw Joe Biggs begin to lead the crowd—which included numerous members of the Proud Boys who had marched to that location—in chants, including the call and response, "Whose house? Our house!" and "Whose Capitol? Our Capitol!"

Within minutes of arriving, members of the crowd began to rush forward past the barricades and on to Capitol grounds. As this happened, Finley looked to Nordean as the recognized leader of the group that had marched the Proud Boys to the Capitol. Finley then saw Nordean advance onto Capitol grounds with other Proud Boys. Finley followed him and other Proud Boys onto Capitol grounds.

At 1:00 p.m., messages were posted in Boots on Ground by a member of the chat that read, "Storming the capital building right now!!" and then, "Get there."

The crowd eventually overran law enforcement and made its way closer to the Capitol building by ascending stairs that led from the plaza to the upper west terrace of the Capitol. Finley

followed the crowd up the stairs. While standing on the upper west terrace of the Capitol, Finley exchanged at least one message with a member of his chapter in which Finley advised the member to join him at the Capitol. Separately, while standing on the upper west terrace of the Capitol at 2:24 p.m., Finley posted the message, "On capital" in the Boots on Ground message group.

Once on the upper west terrace of the Capitol, Finley regrouped with other Proud Boys members. Finley saw Zachary Rehl, the President of the Philadephia chapter (who Finley knew as "Captain Trump"), and other members from Rehl's chapter in Philadelphia. Finley posed for a picture with Rehl and other members of the Philadelphia Proud Boys chapter shortly before the group entered the Capitol building. Finley and others can be seen making the "ok" hand symbol used by the Proud Boys.



A video also depicts the conditions on the Upper West Terrace as Finley discussed next steps with Rehl and the other members. While standing next to Rehl, Finley appears to gesture toward the Senate Wing Door of the Capitol building. One of the members can be heard saying, "I heard

Pence got evacuated." Rehl asked the group, including Finley, whether they wanted to go inside the Capitol building.



Shortly after the conversation, Rehl, Finley and others in the group then entered the Capitol building through the Senate Wing Door at approximately 2:54 p.m. The photo below shows Finley inside the Capitol at approximately 2:55 p.m.



Photos recovered from Finley's device included an image (shown below) of Finley in or near the office of Senator Merkley of Oregon. The image was timestamped 2:58 p.m. The photo was recovered from the ".trash" section of Finley's phone. Rehl and other members of the Philadelphia Proud Boys were also depicted in Senator Merkley's office.



Finley remained in the Capitol building for approximately eight minutes. Finley exited the building at 3:02 p.m. through the Senate Wing Door.



After leaving the Capitol building and Capitol grounds, Finley posted a video message on the Boots on Ground encrypted messaging channel in which he stated, among other things, "I just got out myself, dude, I was in there, you know, fucking taking pictures with the boys. Yo, Captain Trump [*i.e.*, Rehl], proud of your fucking boy." Finley went on to advise those in the message channel about the security at the Capitol. Specifically, Finley told those in the Boots on Ground channel, "We literally can't get back in. Fucking crazy, crazy, crazy lockdown. If you guys come out, you're not getting back in. That's 100%"



Later that evening, Finley posted messages in the Boots on Ground message group that celebrated the activities at the Capitol. Specifically, at 5:09 p.m., Finley posted a message that read, "N**** someone took Pelosi podium" and then "That n**** needs a perry." Finley's

reference to a "Perry" is a reference to a particular shirt that is awarded by Proud Boys to its highest-ranking members.

Following the events at the Capitol on January 6, 2021, Finley took measures to obstruct the government's investigation into criminal conduct at the Capitol. Among other things, Finley deleted his social media accounts and deleted photos and videos of himself and other Proud Boys at the Capitol. As one example, Finley deleted the picture of himself inside Senator Merkley's office. Finley also directed members of his chapter to delete their photographs and advised the presidents of other Proud Boys chapters of his actions, writing in an encrypted message, "Deleted all photos I may have had, advised my boys to as well. No talks about dc on telegram whatsoever and gathering #s as we speak." On January 8, 2021, Finley sent a message to a member of his chapter in which he assured the member that he would not cooperate with the government's investigation, writing "the pics i have on my phone are few, but if i get clipped i'll never say a damn thing, though i'll need someone to torch my fuckin computer[.]"

On or about January 19, 2021, Finley gave an interview to an online media personality known as "Vaush." The interview was posted on YouTube. Antifa, Racism, Family Values & More | Debating a Proud Boy (Jan 19, 2021) available at https://www.youtube.com/watch?v=WaUZMaaKQRw&t=56s. In the interview, Finley claimed, "I don't know any Proud Boys who were even remotely close to being inside of the Capitol." *Id.* at 14:40. Finley later stated, "if you believe the narrative like the Capitol being attacked and shit like that, most of the people that were there were [] Q-Anon believing boomers and shit like that. I would say those are people that actually harmed not only the electoral process, but America as a whole." *Id.* at 1:00:28. When challenged, Finley denied that any Proud Boys were "inside the Capitol." *Id.* Finley's comments appear to recognize the extreme damage that January 6 inflicted

upon America while simultaneously attempting to distance not only himself but other Proud Boys from any involvement in the activity.

*Jeffery Finley's Interview with the FBI*

Finley voluntarily agreed to an interview with the FBI on July 7, 2021. Finley explained that he had traveled to Washington, D.C. and marched with the Proud Boys to be part of the "brotherhood" and to show his support for Enrique Tarrio, the Proud Boys Chairman who had been arrested for destruction of the Black Lives Matter banner prior to January 6, 2021. Finley denied that his actions were calculated to overturn the election results.

Finley explained that he remained on Capitol grounds even after seeing at least one assault on a police officer and after seeing law enforcement deploy pepper balls and flashbangs in an effort to disperse the crowd because he wanted to observe the "craziness" and that it appeared to be a once in a lifetime event. Finley acknowledged that he understood that officers did not want people to go inside the building.

*The Charges and Plea Agreement*

On March 21, 2021, Jeffery Finley was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 18, 2021, Finley was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On April 6, 2022, he pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1): Knowingly Entering and Remaining in any Restricted Building or Grounds without Lawful Authority.  By plea agreement, Jeffery Finley agreed to pay $500 in restitution to the Department of the Treasury.

III.     **Statutory Penalties**

The defendant now faces a sentencing on a single count of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment; a term of supervised release of not more than one year; and a fine of up to $100,000.

IV.     **The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Finley's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Obstruction (U.S.S.G. §3C1.1) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 6 |

*See* PSR at ¶¶ 42-51.

The U.S. Probation Office calculated Finley's criminal history as a category I, which is not disputed. PSR at ¶ 54. Accordingly, the U.S. Probation Office calculated Finley's total adjusted offense level, after acceptance, at 6, and his corresponding Guidelines imprisonment range at 0-6

13

months. PSR at ¶¶ 98. Finley's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness moving forward.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

*v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Finley's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Finley, the absence of violent or destructive acts is not a mitigating factor. Had Finley engaged in such conduct, he or she would have faced additional criminal charges.

Here, Finley's actions on January 6 highlight the danger of mobilizing a large group to engage in unlawful action. In his interview, Finley denied any knowledge of a pre-determined plan by the Proud Boys to enter the Capitol grounds or building on January 6. Nonetheless, Finley joined in the group's endeavors and took actions with the group from the moment that members of his group advanced onto the Capitol. The government assets that, for Finley, taking these actions was part of the "brotherhood" that he had joined.

Finley claims that he came to Washington, D.C. to support President Trump and attend the rally, but Finley did not attend speeches on the Ellipse on January 6. Rather, Finley acted in accordance with instructions that had been disseminated from Proud Boys leadership. Finley arrived at the Washington Monument at approximately 10 a.m. dressed as a "patriot." When the group marched away from the rally at the Ellipse, Finley followed the commands of Proud Boys leadership. Finley marched with the Proud Boys to the Capitol.

The group arrived at the First Street gate near the Peace Monument at approximately 12:50 p.m. Finley saw one of the Proud Boys leaders, Joe Biggs, use a megaphone to lead the crowd in a series of chants, including "Whose house? Our house!" and "Whose Capitol? Our Capitol!" Within minutes of arriving at the Peace Monument, members of the crowd stormed past barriers and overwhelmed police lines.

As one of the first wave of individuals onto Capitol grounds, Finley witnessed first-hand the violence that officers endured. Finley understood that officers were vastly outnumbered and were attempting to regain control of the crowd using tear gas and flashbangs. Despite every indication that Finley was expected to leave, Finley continued to advance toward the Capitol and into the Capitol building. At critical moments in the breach, Finley chose to follow and support the leadership of the Proud Boys in their unlawful activities.

- At 12:53 p.m., Finley followed Proud Boys leaders Nordean and Biggs onto Capitol grounds.
- At 2:30 p.m., Finley conferred with Proud Boys leader, Zach Rehl, and entered the Capitol building.
- At 2:58 p.m., Finley photographed himself outside the office of Senator Merkley, which was occupied by Rehl and others from the Philadelphia Proud Boys.

Even after leaving the Capitol building and its grounds, Finley continued to advance the interest of the group. After leaving the Capitol grounds, Finley posted a message in which he promoted and celebrated Rehl's entry into the Capitol, "I was in there, you know, fucking taking pictures with the boys. Yo, Captain Trump [i.e., Rehl], proud of your fucking boy." Finley advised the group of the lockdown that was happening at the Capitol and advised members that, "If you guys come out, you're not getting back in. That's 100%"

Finley also took action to cover up the Proud Boys conduct on January 6. Finley deleted photographs and videos of his participation in the riot, and Finley also deleted his social media accounts. Finley then used his position of authority as the President of the West Virginia chapter of the Proud Boys to direct others to delete evidence of the crimes at the Capitol.

Even when isolated to his own individual actions, Finley's participation in the riot from its first moment at 12:53 p.m. until after 3:00 p.m. demonstrates a blatant disregard for the safety and security of outnumbered law enforcement and American citizens inside the Capitol on January 6.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Jeffery Finley has no criminal history. ¶¶ 52-58. Finley earned his GED in 2010 and reported periods of employment dating back to 2017. Finley resides with his mother, who formerly served in the U.S. Air Force and currently works for the government.

Finley reportedly joining the Proud Boys in 2019 and later became the President of the West Virginia chapter. Finley indicated that he left the organization in or around May 2022 because he wanted to distance himself from a group that contributed to and led him to make decisions that negatively affected his own life.

Finley's history and characteristics are one of a person who appears to recognize the difference between right and wrong; however, Finley appears to have allowed his allegiance to a brotherhood to lead him to commit unlawful acts. Perhaps most disturbing about this conduct is Finley's efforts to obstruct the government's investigation following the events on January 6. Finley's repeated efforts to protect himself and his brothers raises significant concern about his commitment to advancing the goals of the group even in the aftermath of a domestic tragedy.

In this case, Finley's history and characteristics are the hardest to evaluate. Taken at his current word, he appears remorseful and prepared to commit to a law-abiding life. However, it is difficult to cancel out Finley's actions on January 6 and enduring attempts to defend the reputation of his organization, members of which he knew had participated in criminal acts at the Capitol on January 6.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

On January 6, 2021, Finley did not listen to speakers at the Ellipse. Rather, Finley focused his efforts on supporting his "brothers." When the Proud Boys demonstrated a commitment to unlawful and dangerous behavior, Finley engaged fully in the endeavor. Finley was among the first wave to enter Capitol grounds at 12:53 p.m. with the leaders of the Proud Boys. Finley joined members of his group in defying law enforcement's efforts to get the group to disburse. And Finley joined leadership of the Proud Boys in entering the Capitol building and a Senator's office.

One cannot assess whether the day would have taken a different turn had Finley and those similarly situated elected not to follow others onto Capitol grounds. Finley's conduct made a significant contribution to the riot because of Finley's willingness to serve as a force multiplier on behalf of those he viewed as his brothers.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Finley's actions following the events of January 6 command attention. Even after Finley left the Capitol, Finley posted a message that celebrated the group's achievements and provided operational intelligence to those who may have intended to continue their assault on the Capitol. Finley took specific actions to obstruct the government's investigation, including by deleting his social media accounts and his photos and videos of January 6. Finley also directed his men— lower-ranking members of the West Virginia chapter—to do the same.

Finley then brazenly took to social media to deflect blame away from the Proud Boys members who had stormed the Capitol in an effort to create a false public impression that would benefit his organization. Finley's commitment to the unlawful conduct of his organization is deeply troubling.

While the government acknowledges that Finley claims to have disassociated himself from the Proud Boys, the full history of Finley's conduct raises a question as to whether his disassociation is genuine. According to Finley's own timeline, Finley renounced his association with the Proud Boys only after pleading guilty and while awaiting sentencing.

The government acknowledges that Finley accepted responsibility by entering into this plea agreement, including accepting responsibility for his efforts to obstruct the government's investigation. On the other hand, Finley's fierce defense of his organization and the spreading of false propaganda relating to the attack on the Capitol underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Finley based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Finley has pleaded guilty to Count One of the Superseding Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

---

[2] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In terms of his participation as part of a group or squad, Finley's participation in the riot is more serious than that of Benjamin Larocca, who (like Finley) bore direct witness to chaos and violence while celebrating and documenting his participation with others throughout the day. *United States v. Larocca*, 21-cr-317 (TSC). For his part, Larocca was sentenced to 60 days of incarceration and 12 months of supervised release. In contrast to Larocca, Finley was among the first wave of rioters onto Capitol grounds at approximately 12:53 p.m. Rather than be dissuaded by the scenes of violence and the officers' desperate attempts to disperse the crowd for *nearly two hours* outside the Capitol, Finley continued to celebrate with members of his group and advanced into the Capitol with his group. Finley may claim that his actions are attributable to a form of "mob-mentality," but his photographs and messages reveal *his* reality—Finley's actions were in furtherance of *his* crew. This mentality is plainly evidenced by Finley's messages after the attack where he (1) celebrated and advised other members of the Proud Boys as to the defenses at the Capitol ("We literally can't get back in. Fucking crazy, crazy, crazy lockdown. If you guys come

out, you're not getting back in. That's 100%"), and (2) subsequently advised other members to delete evidence of their crimes ("Deleted all photos I may have had, advised my boys to as well.").

The government also notes the recent sentencing of Ryan Ashlock to 70 days' incarceration following Ashlock's guilty plea to 18 U.S.C. § 1752(a)(1). *See United States v. Kuehne*, 21-cr-160-6 (TJK), ECF 174. Like Finley, Ashlock marched from the Washington Monument to the U.S. Capitol with a large group of Proud Boys, and Ashlock stormed onto Capitol grounds with the group at approximately 12:53 p.m. *See* Gov't Sentencing Memorandum (ECF 169) at *2, 7-10. Ashlock wore protective gear and made direct physical contributions to the riot, including ripping up a fence and pulling on a barrier that police were attempting to secure. *Id.* Ashlock did not enter the building; indeed, Ashlock was deterred from the Capitol grounds and left the area. *Id.* While Ashlock's direct physical contributions to the riot may be deemed more significant, Finley's continued participation in a group effort, including his entry onto Capitol grounds and entry into the building with members of his group enabled the mob to exercise its dominance in numbers. As shown below, Finley posed for photographs with other members of the Proud Boys shortly before entering the Capitol building.



Once inside the building, Finley took a selfie at the threshold of Senator Merkley's office. While Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office and thus represents a show of intimidation and display of power, above and beyond entering the building. In this regard, and in its entirety, Finley's actions are more serious than those of Defendant Matthew Mazzocco. In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the "Spouse's Lounge" of the Capitol, and this Court sentenced the defendant to 45 days of incarceration. Mazzocco took smirking photographs of himself during the riot. *Mazzocco*, 21-cr-54, ECF 28 at 2, 12. Mazzocco entered through the Senate Wing Door not long after Finley and then proceeded to the "Spouse's Lounge" (similar to Senator Merkley's office) before exiting the Capitol 12 minutes after his entry. *See id.* at 3, 7-8, 13. The entirety of Mazzocco's conduct pales in comparison to Finley's given Finley's nearly two hours on Capitol grounds prior to his entry into the Capitol and his contributions to other rioters' efforts that day and in the days that followed (*e.g.*, advising his men to delete evidence).[3]

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient

---

[3] The government acknowledges that Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez*, 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez*, Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards*, 21-cr-366 (JEB).

sentence. Balancing these factors, the government recommends that this Court sentence Jeffery Finley to three months' incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:      */s/  Jason McCullough*
<div style="margin-left:40%">

JASON B.A. MCCULLOUGH
D.C. Bar No. 998006; NY Bar No. 4544953
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7233
jason.mccullough2@usdoj.gov

</div>